**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

**COPPER TREE OFFICE PARK CONDOMINIUM ASSOCIATION, INC.**, a Colorado corporation,

   Plaintiffs,

v.

**SENECA INSURANCE COMPANY, INC.**, a New York corporation,

   Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

COMES NOW Plaintiff Copper Tree Office Park Condominium Association, Inc. ("Plaintiff"), by and through its attorneys, Furtado Law PC, for its Complaint against the above-named Defendant Seneca Insurance Company, Inc., and states as follows:

**I.   NATURE OF THE ACTION**

1. Plaintiff brings this action seeking economic and non-economic damages related to Defendant's breach of an insurance contract and statutory claims pursuant to C.R.S. §§10-3-1115 and 10-3-1116 arising from Defendant's unreasonable delay and denial of covered insurance benefits including recoverable depreciation.

## II.   PARTIES

2.  Copper Tree Office Park Condominium Association, Inc. ("Plaintiff") is a Colorado corporation with its principal place of business at 1227 Lake Plaza Drive, Suite C, Colorado Springs, CO 80906.

3.  Seneca Insurance Company, Inc. ("Defendant") is a foreign corporation with its principal place of business located in New York and is authorized to do business in Colorado.

## III. JURISDICTION AND VENUE

4.  Jurisdiction is asserted pursuant to 28 U.S.C. §1332 and 28 U.S.C. § 1391. The amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties. Venue is proper because Defendant's insurance policy was purchased in Colorado and was intended to provide coverage for a property located in Colorado.

## IV. GENERAL ALLEGATIONS

5.  Plaintiff sought and obtained an insurance policy, Policy No. SCC 2031802 (hereinafter "the Policy"), from Defendant for residential condominiums located on Lake Plaza Drive, Colorado Springs, CO 80906 (hereinafter "the Property").

6.  On or about July 28, 2016, a hail and windstorm hit Plaintiff's Property causing property damage.

7.  On or about March 23, 2017, immediately after Plaintiff learned of the damage to its Property, Plaintiff filed its claim with Defendant and Defendant issued Plaintiff claims number 17CCN183. Defendant then assigned the claim to its local third-party administrator Engle Martin and Associates ("EMA") to investigate the loss.

8. On or about March 27, 2017, Russell Clark with EMA inspected Plaintiff's Property for covered damage from the date of loss.

9. On or about April 13, 2017, Defendant hired Envista Forensics to inspect Plaintiff's Property for damage related to the date of loss.

10. On or about April 19, 2017, Amber Prom with Envista Forensics sent her first report to defendant that concluded that EPDM roof displayed no hail damage and that the interior damage noted at the Property was caused by long-term deterioration or improper installation of the EPDM roofing system.

11. On or about May 8, 2017, Defendant requested Ms. Prom to perform a re-inspection of Plaintiff's Property damage to determine the extent of damage to the metal-panel mansards at the Property and to examine the Property for window damage.

12. On or about May 18, 2017, Plaintiff hired Disaster Consulting Services, LLC ("DCS") as its construction consultant to accurately document covered damages from the date of loss.

13. On or about May 18, 2017, DCS prepared a hail evaluation report for Plaintiff for its hail loss which concluded as follows:

   a. Weather data confirmed that the hail size from the July 28, 2016 at Plaintiff's Property was anywhere from 1.5 inches in diameter to 3 inches in diameter on that date.

   b. The observed damage to the roof, windows and standing seam metal siding was likely caused by the July 28, 2016 hailstorm. Damage was confirmed by walking the roofs and DCS thoroughly documented the damage as noted in DCS's report.

   c. The roof, windows and standing seam metal siding was damaged from the date of loss to the point that full replacement of these materials is necessary.

14. On or about May 30, 2017, Engle Martin & Associates drafted an estimate for their observed damages at the Property with a replacement cost value of $113,490.56.

15. On or about June 1, 2017, DCS drafted its estimate for repairs related to the date of loss with a replacement cost value of $659,782.14.

16. On or about June 7, 2017, Ms. Prom sent Defendant her second report of damages that concluded the metal-panel mansards were not 'functionally hail-damaged' but did exhibit damage consistent with hail impacts from the date of loss on the south-facing elevations.

17. Upon information and belief, Ms. Prom's conclusion that damage is not functional in nature misstates Plaintiff's Policy coverage as Plaintiff's Policy with Defendant includes no cosmetic damage rider.

18. Ms. Prom also concluded in her report that the metal-framed windows exhibited roughly circular indentations in the glazing bead consistent with hail damage from the date of loss but only on the southern elevation of the Property.

19. On or about July 10, 2017, Defendant sent Plaintiff its claims payment in the amount of $17,955.94 (EMA's RCV amount of $113,490.56 minus recoverable depreciation of $51,247.16 minus Plaintiff's deductible amount of $44,287.46). Upon information and belief, Defendant unreasonably delayed payment of this claims payment as it made its claims determination of damages on May 30, 2017 and there is no reasonable basis for delaying payment of covered benefits for over 40 days.

20. On or about July 12, 2017, however, Defendant requested that Ms. Prom reevaluate her previous causation analysis for damage on the metal-panels. Upon information and belief, Defendant's request to reevaluate this decision is without a reasonable basis and merely an attempt to reduce Defendant's financial exposure on the claim.

21. On or about July 17, 2017, Ms. Prom sent Defendant her second supplemental report of findings changing the date of damage on the metal panel mansards to June 6, 2012.

22. On or about July 20, 2017, Defendant's adjuster Fran Leone sent Plaintiff Defendant's coverage decision letter outlining its investigation of claim and specifically that Defendant observed no damage to the roof from the date of loss and that the interior water damage is the result of long term deterioration or improper installation. However, Defendant did agree there was covered damage to the southern facing elevations of the windows and the mansard sidings from the date of loss. As such, Defendant determined that its claims payment owed was $17,955.94.

23. Mr. Leone also outlined in this letter that window and siding damage on the other elevations of the Property were caused prior to the Policy inception date of March 1, 2015.

24. On or about October 11, 2017, Defendant asked Ms. Prom to reinspect the Property's roofs with Plaintiff's public adjuster Matthew Stalcup and Plaintiff's construction consultant Justen Newton. Upon information and belief, Russell Clark also attended the inspection.

25. Upon information and belief, however, the inspection occurred on May 7, 2018. During this inspection, Ms. Prom and Mr. Newton conducted their own core sample inspections. Upon information and belief, during the inspection the following also occurred:

   a. Ms. Prom explained to Mr. Newton that she was changing her opinion regarding the direction of the hail damage from the south direction to the southwest direction. Therefore, two elevations of the Property were affected by hail damage from the date of loss.

   b. Mr. Prom explained that her report made no sense and was unique among the hundreds of roofs she has inspected in the past. However, Ms. Prom stood by her report based on her failure to observe splatter marks on other elevations.

   c. Mr. Clark observed the hail damaged HVAC units with damage on the south and southwest sides and agreed he would include that damage in his new estimate. However, Mr. Clark did not inspect all the HVAC units for damage.

   d. Regarding HVAC unit damage, Ms. Prom stated to Mr. Newton that she included all HVAC unit damage in her original inspection. However, Defendant has yet to provide coverage for HVAC damage.

26. Upon information and belief, Ms. Prom unreasonably investigated Plaintiff's claim for benefits and Defendant should have estimated covered damages based upon at least two affected elevations on each building at Plaintiff's Property. The amount of this unreasonable delayed and denied benefit is in DCS' estimate.

27. On or about May 11, 2018, Defendant's engineer Amber Prom with Envista Forensics drafted her third supplemental report of findings. In this report, Ms. Prom concluded again that the EPDM roofing did not exhibit hail damage but instead isolated tears in the membrane were caused by long-term tensile stresses in the EPDM membrane from the prior gravel ballast bed previously installed on the roof.

6

28. Upon information and belief, however, Ms. Prom's evaluation of the damage of the EPDM roofing system fails to properly differentiate hail damage from gravel stress points resulting in tears. Plaintiff's EPDM roof covering, for instance, is an EPDM covering on top a previously installed gravel bed. During installation of the current system, the installers removed the previous gravel bed but did not completely remove all traces of gravel. The result is that at certain points on the roofing system, there exists stressed EPDM membrane points. During hailstorms like the one at issue in this case, when hail hits a stress points, the result is called an "anvil strike." These strikes are commonly identified as hail damage and not excluded from coverage by insurers.

29. Upon information and belief, Ms. Prom improperly concluded in her third re-inspection of the Property that circular cuts in the membrane just beneath trapped gravel was definitively not evidence of hail damage. Ms. Prom based this mistaken conclusion on a HAAG Commercial Roofs Course Workbook instead of on an independent source or her own experience with this type of damage. There is no indication that Ms. Prom verified that the HAAG coursebook was accurate or peer reviewed.

30. Upon information and belief, assuming the EPDM roof is damaged, Defendant would owe for full roof replacement as estimated by DCS.

31. On or about May 18, 2018, Defendant's adjuster Fran Leone sent Mr. Thompson a letter regarding its May 7, 2018 reinspection and denying Plaintiff's claim again as Defendant found no additional damage to the roof.

32. Although Defendant had the necessary documentation during the claim process to identify the proper scope of repairs and price for Plaintiff's claim, Defendant unreasonably delayed and denied covered benefits by conducting a cursory and biased investigation of Plaintiff's claim.

33. As a consequence of Defendant's conduct in unreasonably delaying and denying Plaintiff's claims for benefits due and owing under the Policy, Plaintiff has incurred and continues to incur damages.

### V.   FIRST CLAIM FOR RELIEF
(*Breach of Contract*)

34. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein.

35. The Policy creates a contract of insurance.

36. By its actions, as described above, Defendant breached the contract of insurance by failing to consider all relevant information submitted by Plaintiff on the claim and failing to pay covered benefits under the Policy.

37. As a direct and proximate result of said breach, the Plaintiff is entitled to damages in an amount to be determined at trial.

### VI.   SECOND CLAIM FOR RELIEF
*(Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)*

38. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein.

39. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

40. Plaintiff is a first-party claimant under C.R.S. §10-3-1115.

41. Defendant has denied the Plaintiff's claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

42. C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

43. Because of Defendant's actions, as described above, violate C.R.S. §10-3-1115, Plaintiff brings this claim to recover its reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. §10-3-1116.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks that this Court enter judgment in its favor and against Defendant on its Claims for Relief as follows:

1.      All unpaid covered benefits owed under the Policy;

2.      Two times the amount of all covered benefits under the Policy;

3.      Costs, expert witness fees, and attorneys' fees per statute incurred in prosecuting its claims;

4.      Pre- and post-judgment interest; and

5.      For such other and further relief as this Court may deem just.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

Respectfully submitted this 19th day of July 2018.

FURTADO LAW PC

*/s/ Nathanael Archuleta*
David Furtado, Esq.
Nathanael Archuleta, Esq.
Katherine Goodrich, Esq.

9

Furtado Law PC
3773 Cherry Creek North Drive,
Ste. 755
Denver, CO 80209
Telephone: (303) 755-2929
Email:        Dfurtado@furtadolaw.com
              Nathanael@furtadolaw.com
              katie@furtadolaw.com
Attorneys for Plaintiff